**LACKEY** et al. v. **MOFFETT** et ux.

No. 14535.

Court of Civil Appeals of Texas.
Fort Worth.

June 4, 1943.

Todd, Crowley & Gambill, of Fort Worth, for appellants.

Thomas & Thomas, of Big Spring, for appellees Leon Moffett et ux.

Byron Matthews, of Fort Worth, for intervener St. Paul Fire & Marine Ins. Co.

SPEER, Justice.

This is an automobile collision case. Plaintiffs Leon Moffett and wife, Iva Mae Moffett, sued Ted N. Lackey and Roy D. Martin for damages resulting from injuries sustained at the time of the accident. We shall refer to the parties as they were in the trial court, except where necessary to call names.

At the time of the accident, Mrs. Moffett and her 21 year old daughter, Willie Moffett, were on their way from Little Rock, Arkansas, to Brownwood, Texas, traveling in the family Oldsmobile, the daughter driving at the time of the collision. She was killed and the mother seriously injured.

Defendant Lackey was an employee of defendant Martin and as such employee drove a large truck and semi-trailer to deliver lumber from Fort Worth to Brownwood on the occasion in question. Lackey had a load of lumber on his trailer and started to Brownwood after daylight in the early hours of the morning. When out about fourteen miles on the highway, it began to rain and he stopped his truck to cover the lumber. The Moffett car followed and ran into defendants' truck, causing the injuries complained of.

Plaintiffs' action was based upon alleged negligence of Lackey, the truck driver, and

defendants resisted on general denial of negligence and pleas of contributory negligence of Mrs. Moffett and her daughter.

St. Paul Fire & Marine Insurance Co. was permitted to intervene and assert a claim against defendants, in subrogation, for an amount it had paid plaintiffs under a policy of insurance on damages to the Moffett car. Intervener was awarded a recovery for the amount so paid on the policy, along with the judgment in favor of plaintiffs. Defendants' appeal is also against the judgment in favor of the intervener.

A jury verdict convicted defendants of negligence in more than one respect and acquitted the Moffetts of contributory negligence. A finding of damages by the jury resulted in a judgment in favor of plaintiffs against defendants for the amount found, and in favor of the intervener, from which judgment defendants have appealed.

Defendants seek reversal upon many points presented in their briefs. Points one and two assert error in refusal by the trial court (a) to give their requested peremptory instruction, and (b) in refusing their motion for judgment notwithstanding the verdict. These two points are based upon the theory that the facts disclose Mrs. Moffett and Miss Willie Moffett were guilty of contributory negligence, proximately causing the injuries, as a matter of law.

 Much has been said by our courts on the question of primary and contributory negligence. Of course, one may be guilty of either negligence or contributory negligence as a matter of law, but the general rule is that it is a question of fact for jury determination. As applicable to the instant case, the motion for judgment non obstante veredicto should not have been sustained unless an instructed verdict for defendant should have been given. Rule 301, Texas Rules Civil Procedure. We must therefore determine if such instructed verdict should have been given. It is now settled that in determining whether or not an instructed verdict should have been given, all testimony in the case must be considered in its most favorable light to the one against whom the instructed verdict is sought; conflicts will be disregarded and every reasonable intendment deducible from the evidence must be indulged in his favor. Anglin v. Cisco Mortg. Loan Co., 135 Tex. 188, 141 S.W.2d 935; Le Master v. Ft. Worth Transit Co., 138 Tex. 512, 160 S.W.2d 224.

The accident happened around 7:30 o'clock in the morning on a cloudy day. It had been drizzling rain during the early hours and as Lackey began to ascend the east side of a grade or hill it began raining harder, and being afraid to stop his truck with its load, on an up-grade, drove on to the top and passed the summit and went down the next slope about 140 feet by measurement; there, he pulled over to his right where the gravel shoulder was seven feet wide to where it slanted off to a muddy ditch, stopped his truck partly on the shoulder but his left hand dual wheels were on the pavement a distance of 18 to 24 inches (witnesses disagree as to exact distance). Fifty five feet farther the shoulder was eleven feet wide; his truck was approximately seven feet wide. Immediately after stopping, Lackey began to unroll and spread his tarpaulin over his load of lumber which, as loaded, extended approximately ten feet from its top to the ground. An engineer testified the hill or grade on the east which Lackey had ascended was a 2% grade, while the one on the west which he started to descend was a 2½% grade.

Obviously, under normal conditions of visibility, parts of the truck and its load could have been seen at a considerable distance from the east, even before reaching the crest of the hill. This is true because the engineer said the ground where the truck stood was one foot and a half lower than the top or crest of the hill. Two disinterested witnesses testified, however, that a short time after the accident happened, with knowledge of the exact location, they approached the scene from the east (the direction from which the Moffett car approached it) and neither of them could see any part of the truck or its load until they were "right on it". We take this to mean at most, they did not see it until they were at the crest of the hill, which was 140 feet from the place of the accident. One of those witnesses said the range of visibility was approximately 100 feet. We are not advised how long after the accident it was when these observations were made; there are intimations from which it may be inferred that it was perhaps an hour later. Nor is there any comparison of atmospheric conditions and visibility when the two situations arose. Miss Moffett, the driver of the Oldsmobile, is dead and we

will never know what she saw. Mrs. Moffett, who received serious injuries at the time, testified in the case and when asked as to what happened, said: "My memory just seems to have gone; I just don't remember." It is apparent from the record that neither side insisted upon a more definite explanation.

At the top of the hill, the paved highway makes a slight turn to the right, and a photograph made of a car (perhaps on a clear day) shows a car standing where the truck stood, and when viewed from a point east of the crest, indicates that the car is standing off the highway. From the top of the hill, if visibility permitted, anyone could see that the truck was partly on the pavement. It was raining and the pavement was slick. The Oldsmobile was traveling at approximately 30 to 35 miles per hour; at this rate of speed the car would cover the 140 feet to the truck in approximately three seconds. Mr. Houston, the only disinterested eye-witness to the accident, said he was approaching the scene from the west (facing the Lackey truck), placing himself at the time the Oldsmobile came over the hill in front of him, near a culvert which is 750 feet west of the point where he first saw the Moffett car; he said the Moffett car was traveling 30 to 35 miles per hour and that after it came into the range of his vision, the car was traveling within a foot or eighteen inches of the driver's right hand edge of the pavement; that it skidded to its left and righted itself and that it skidded again just before it struck the back end of the parked truck. This part of the story is rather inconsistent with other parts of the witness' version of visibility, but it is the best we have. Photographs of the Moffett car taken after the accident disclose unmistakably that the left hand front, left fender, left front of the cowl and windshield frame and left door were crushed, and that the right hand front of the radiator, the right hand lamp, fender or other part on that side received no part of the impact. Viewing the whole situation as thus presented, can it be said that the record discloses that the driver of the Oldsmobile was guilty of contributory negligence as a matter of law?

It must be conceded that the rule established in this state is that generally the question of whether or not facts disclose negligence or contributory negligence and proximate cause are questions of fact for jury determination. It is equally true that there are exceptions to this general rule, but they are said by our Supreme Court to be rare. Seinsheimer v. Burkhart, 132 Tex. 336, 122 S.W.2d 1063. However, our courts will not close their eyes to a state of facts which discloses contributory negligence as a matter of law. After all is said, each case as a rule rests upon the facts involved. This court had occasion to discuss the point in Cross v. Wichita Falls & S. R. Co., Tex.Civ.App., 140 S.W.2d 567. That case involved a different situation to that now before us, and did not reach the Supreme Court, but we cite it because of the collation of the authorities there pointed out.

The great weight of Texas authorities bearing upon the question of whether or not an instructed verdict should be given lays down the rule that if reasonable minds could draw different conclusions from all the facts presented, a jury question is raised. Commercial Standard Ins. Co. v. Davis, 134 Tex. 487, 489, 137 S.W. 2d 1; Le Master v. Ft. Worth Transit Co., 138 Tex. 512, 160 S.W.2d 224; Pope v. Clary, Tex.Civ.App., 161 S.W.2d 828, writ refused, want of merit.

In the Le Master case, supra, it was held that the burden of proving contributory negligence of plaintiff rests with the defendant. We think that under the facts revealed by the rather uncertain and speculative testimony given, only a jury question was raised, and the matter having been submitted to the jury, all of defendants' contentions here presented were resolved against them by the jury. The verdict, however, is not the test because when a request is made for a summary instruction no verdict has been had, but the verdict may be persuasive that reasonable minds could differ on the point. It is no answer to such questions for one to sit in a quiet moment and theorize upon the many ways in which the unfortunate incident could have been avoided, but we must view it as the Moffetts were required to observe the situation. If they saw the truck or any part of its load before they reached the crest of the hill, it had the appearance of being off the pavement and with that impression in the mind of the driver, she doubtless did, as was her duty, keep to the right on the pavement as she topped the hill, to avoid traffic coming up on the other side going in the opposite direction. Upon reaching the crest, she

had her first opportunity to see that the truck occupied a part of the pavement on the side upon which she was driving and then she had approximately three seconds to take in the dangerous situation and change her course before striking the truck. It cannot be fairly said that the driver of the Oldsmobile made no effort to prevent the accident after she thus discovered her peril; it is obvious from the testimony that she left the extreme right hand side of the pavement while traversing the 140 feet to the truck, for she either skidded or turned to her left; the witness said she skidded; obviously she either attempted to turn to the left or to put on her brakes to stop the car or slow her speed; this is revealed by the testimony of Mr. Houston. This movement placed her further from the right hand edge of the pavement, but we do not know how far nor do we know whether if she had gone straight from that point that she would have missed the truck. There is what we deem a surmise by the witness Houston to the effect that the driver of the Oldsmobile feared she would meet the witness' truck at the point where Lackey's truck was parked and she again "swerved" and hit the parked truck. It is apparent that from the last described position the left hand front of the Moffett car struck the truck and the extended ends of the lumber, resulting in the injuries. From all the facts and circumstances we do not think it was made to appear that the acts of the Moffetts constituted contributory negligence as a matter of law, and points one and two are overruled.

Points three to seven, inclusive, assert jury misconduct. They were presented in motion for new trial and overruled by the trial court. The points in their order complain of discussions by the jury while deliberating, of (3) liability insurance; (4) knowledge by one juror of a woman who had her ankles broken and had both feet amputated; (5) attorney's fees; (6) the necessity of putting out flags and flares where vehicles were parked on the pavement; and (7) the law about operating a truck with a load of lumber on it projecting past the rear end, without a flag or light on the back end.

■ The troublesome question of jury misconduct has, in the past, been the source of much legal dispute and one about which our courts have held varying views. In an effort to eliminate much of the existing confusion, Rule 327, Rules of Civil Procedure was passed. It is obvious that the rule has not and will not prevent jurors infringing the plain, simple and understandable importunities of trial courts. When, in spite of the rule, we are confronted with such violations, we must strive to arrive at (a) whether or not such acts were material to the rights of litigants, and (b) whether or not it reasonably appears that injury probably resulted to the complaining party. These two matters are closely related and after the alleged misconduct has been established, its materiality and reasonably probable effect on the verdict · become questions of law to be determined by the trial and appellate courts. Barrington v. Duncan, Tex.Sup., 169 S.W.2d 462; Tumlinson v. San Antonio Brewing Ass'n, Tex. Civ.App., 170 S.W.2d 620.

In this case, all jurors were recalled and testified at the hearing for new trial. Court denied the new trial, finding, in effect, that the alleged misconduct occurred, but that it did not affect the verdict returned. The judgment in this respect states: "The jurors further testified that the matter of insurance was discussed, but that such discussion was casual and the Court finds that such discussion in nowise affected the verdict returned—that is, it did not cause an amount, either more or less, to be returned than would have been returned if such discussion had not occurred, and inasmuch as the insurance company was involved in, and a party to, the suit, that such discussion would naturally have arisen. The testimony of the jurors further showed that there was some discussion by jurors as to extraneous matters, but the court finds from the testimony of the jurors that such discussion did not, in anywise, affect the respective amounts returned as the verdict of the jurors."

The substance of the testimony in the jury room about liability insurance carried by the owner of the lumber truck, boiled down from questions and answers, is that at the beginning of their deliberations some of the jurors wanted to award damages to Mrs. Moffett in the sum of $500, while others ranged higher, the maximum amounts being $25,000. To reach a beginning point from which to discuss the amount, a temporary quotient amount was reached by adding up the aggregate amounts and dividing by twelve, with the understanding that no one should be bound

by the result, but they would begin to work from that amount. The result was $9,000. The jury was not satisfied with this figure and while preparing to ballot again, a juror said, in substance, that Martin (owner of the truck) had to carry insurance and that the insurance company would have to pay the judgment, anyway. There was a difference of opinion among the jurors as to the amount of insurance Martin was required to carry, no one seemed to know the exact amount, but their opinions about the amount carried ranged from $5,000 to $20,000. The matter of liability insurance was being discussed and the result of that ballot was to raise the amount of the award from $9,000 previously voted to $13,000. Four or five of the jurors entered into the discussion of liability insurance. When they got the $13,000 quotient, one juror said he was superstitious about rendering a verdict for $13,000 and wanted it changed. They, by agreement, reduced it to $12,900. The jurors who had previously held out for a $500 award to Mrs. Moffett, agreed after the last ballot to award $12,900. The foreman told the jurors not to consider anything that was not in evidence and they did not discuss insurance any more. Some jurors said they did not hear any discussion about insurance. During the deliberations one juror asked another what amount of the judgment the lawyers would get, and the one so asked replied laughingly that they were supposed to get a good bit of it. The one who made the reply said he did not think the matter of attorney's fees was mentioned as an argument to bring anybody up, because he was a high man anyway.

There was testimony from jurors that while they were trying to decide whether the truck driver was negligent in parking his truck partly on the pavement, there was discussion to the effect that it was a violation of the law to park a truck with any part of it on the pavement without putting out flags and flares; the same juror said he knew this was a violation of the law before anyone said it. One juror said, while they were discussing the amount of damages to be awarded to Mrs. Moffett, who had her ankles broken, that he knew a lady who had her ankles broken and later had both feet amputated; the juror said the foreman stopped the other juror from relating that matter, and it was not known if any other juror heard it. All of the ju-

rors testified, over objection of appellants, that none of the extraneous matters discussed affected their verdict.

Omitting many repetitions and various forms in which the jurors detailed transactions, the foregoing is a fair summary of the matters pertinent to the errors assigned.

The testimony of the jurors clearly indicates that the trial court, when he had finished reading his charge, orally instructed them not to indulge in any discussions of matters not brought out in the evidence, in arriving at their verdict, and in spite of the court's efforts, several of the jurors related the things above pointed out. Nothing we could here say would aid the individual juror in performing jury service, for the reason he would never see or read it. The trial court went as far as he consistently could, at the time. The latest expression by our Supreme Court in such matters is found in Barrington v. Duncan, Tex.Sup., 169 S.W.2d 462. In that case, as in this, the jury went out and discussed the necessity of owners of trucks first procuring liability insurance before receiving a permit to operate on the highways. It was there held that such declarations by the jury were tantamount to giving "evidence" that the truck owner did have insurance. These further principles were announced by the court in that case: (1) That when the trial court finds as a fact that the alleged misconduct occurred, it is final, and whether or not the misconduct probably resulted in injury is a question of law for the reviewing court; (2) A juror may not preserve or destroy his verdict by testifying to the mental processes by which he reached the same (citing Sproles Motor Freight Lines v. Long, Tex.Sup., 168 S.W.2d 642); (3) The previous rule requiring a reversal for misconduct if the court had a reasonable doubt as to whether or not the misconduct affected the verdict, no longer exists; and (4) in determining whether or not the misconduct was material and probably resulted in injury to the complaining party, the court will inspect and consider the whole record, including the pleadings and all evidence adduced, both upon the main trial and the motion for rehearing. As we construe the principles pointed out, they are not changed by the later opinion by the Commission of Appeals adopted by the Supreme Court in Akers v. Epperson, 171 S.W.2d 483.

Plaintiffs' allegations of negligence by defendants were: "(8) That the defendant Ted N. Lackey failed to place out signals of any kind, flags or flares, and he did not intend to do so. (9) That the defendant was negligent in stopping his truck on the asphalt portion of the highway, in failing to drive his truck to a portion of the shoulder of the highway where the truck would have been out of the way of the passing traffic, in failing to put out flags or flares, and such negligence in each and all respects were proximate causes of the injuries sustained by the plaintiffs herein."

There was proof that the lumber was so loaded on the truck that ends extended beyond the rear of the trailer bed, but no allegations were made that defendants failed to put a red flag or red light on the rear end of such extended load. There is absolutely no testimony showing whether or not flags and flares were put out in front of and behind said truck. It is obvious, from the summary of the evidence given by the jurors, that they did, while trying to determine if defendant was guilty of negligence in parking his truck where he did, state that the law required him to put out such flags and flares. One juror said that such discussion may have had some effect on his verdict, but explained that the mere statement by another that the law required it did not affect his verdict because he knew it anyway. Here, we have a conviction of defendants of negligence for failure to put out flags and flares, without any evidence from the witness stand to support it.

Referable to the discussion of liability insurance, little doubt exists that one or more of the jurors said during their deliberations, substantially, that the law required owners of trucks to carry liability insurance, and that such discussion was going on while they were discussing and voting upon the amount of damages to be awarded for Mrs. Moffett's injuries; there being no such testimony offered, the statements were tantamount to giving evidence to the jury by those making such statements, during their deliberations.

■■■■ It may be that in most cases like this, the materiality of such conduct and whether injury probably resulted to the complaining party, would be somewhat speculative. Neither we nor the trial court should consider any statement by a juror which tended to bolster or impeach his verdict for such testimony is incompetent and has no probative value. Sproles Motor Freight Lines v. Long, supra. The Supreme Court, in the Barrington case, supra, said that the court would take judicial knowledge of the fact that a jury is more apt to render judgment against a defendant, and for a larger amount, if it knows that the defendant is protected by insurance; citing Kuntz v. Spence, Tex. Com.App., 67 S.W.2d 254. In view of the whole record in this case, we think it inescapable that probable injury resulted to these defendants more especially from the discussion of liability insurance and the disclosure by some of the jurors to others concerning requirements of law about putting out flags and flares. We are unwilling to hold that the discussion of attorney's fees and knowledge of a juror that he knew of a woman who had her feet amputated after having her ankles broken, as casual and brief as the statements were, would necessarily result in a reversal of the judgment. But viewing the entire record as we must, we think a reversal must follow.

■■■■ There is no merit in the eighth point. There complaint is made for the refusal of the court to submit defendants' requested issue, inquiring if the driver of the Moffett car failed to steer her car so that it stayed on the part of the highway usually traveled by other vehicles; and conditionally, if such failure was negligence, and a proximate cause. This inquiry, with the ancillary questions, were evidentiary matters, fully covered by the issues that were submitted.

■■■■ Ninth and tenth points assert error in the submission of Special Issues two and three. No. Two inquired if it was negligence for defendant to park his truck and trailer at the place where the jury may find that he did park it, and No. Three, conditionally, inquired if such negligence was a proximate cause. The pleadings were sufficient to support testimony on the issues. Number Two is not a general charge, nor is it multifarious or duplicitous. The evidence was uncontradicted that the truck stood partly on the pavement, and that if the driver had gone about 55 feet further, the shoulder was wide enough that he could have parked his truck entirely off the pavement. The points are overruled.

Points eleven to twenty-two assert error in the submission of special issues 4 to 7, inclusive. There inquiries were whether or not Lackey was negligent in failing to put out flares and flags as a warning to approaching traffic, along with ancillary inquiries, conditioned upon answers given, if said failures were proximate causes. These points must be sustained, for two reasons: (1) There was no evidence on the questions inquired about, and (2) the inquiries were so framed as to assume that Lackey had failed to do either. It is argued by plaintiffs that Lackey undertook to testify to all of his acts from the time he stopped his truck until the time of the collision, and he said nothing about putting out flares or flags, and that this is some evidence that he did not put them out. Neither Lackey nor any other person on the scene immediately after the accident was asked about such matters. Certainly the evidence was not sufficiently conclusive to warrant the assumption that none were out.

In view of what has been said, we are of the opinion and so hold that reversible error was committed in the respects mentioned. The judgment of the trial court is therefore reversed and the cause remanded.