**GILLESPIE v. ROSSI.**

No. 2940.

Court of Civil Appeals of Texas.
Waco.

March 15, 1951.

Rehearing Denied April 12, 1951.

548

McCampbell, Wood & Kirkham, and Scott & Dancer, all of Corpus Christi, for appellant.

Kemp, Lewright, Dyer & Sorrell, Corpus Christi, Moursund, Ball, Moursund & Bergstrom, San Antonio, for appellee.

LESTER, Chief Justice.

T. M. Gillespie filed suit in the District Court of Nueces County against Frank A. Rossi to recover damages for personal injuries he sustained as the result of a collision between his motorcycle and a car operated by Rossi. Gillespie was on duty as a motorcycle policeman for the City of Corpus Christi. He testified that at the time of the collision he was in pursuit of a car that he suspected was being driven at an excessive rate of speed and in a reckless manner. The collision occurred on Timon Boulevard in the city of Corpus Christi, which is a heavily traveled thoroughfare.

Travelers Insurance Company intervened, alleging the company had issued to the City of Corpus Christi a voluntary policy of workmen's compensation insurance, under the provisions of which all employees of said city while in the scope of their employment are insured againt accidental injury or death and are to be paid the same benefits as provided for under the Workmen's Compensation Act of Texas. It sought to be subrogated for the amount it had already paid to Gillespie and for his benefit and for any additional amount that it might be required to pay in the future as the result of his injuries. The Insurance Company also adopted the allegations of the plaintiff's petition as to his injuries and the negligence of the defendant.

The parties will be referred to as "plaintiff" and "defendant," as they appeared in the lower court, and the intervenor as "the Insurance Company."

The court submitted the case to the jury upon special issues. The jury found the defendant guilty of three acts of primary negligence, and that each was a proximate cause of plaintiff's injuries. To Special Issue No. 18 the jury found the plaintiff guilty of negligence in failing to sound the siren upon his motorcycle sooner than he did, and to Issue No. 19 found that such negligence was a proximate cause of the collision. To Issues Nos. 28 and 29 the jury found plaintiff sustained damages to the extent of $17,500 as a proximate result of his injuries.

Based upon the findings of the jury the court, on January 18, 1950, rendered and entered judgment for the defendant. Plaintiff, on January 23rd, filed his motion for a new trial. Among the errors assigned in his motion were alleged acts of misconduct upon the part of the jury during their deliberations, and alleged misconduct of opposing counsel during the trial of said cause. The court heard the motion on February 4th, and at said hearing several of the jurors appeared and testified. The court took the motion under advisement but never entered his order granting or refusing it. No agreement to extend the time for the court to act upon said motion was obtained. Therefore, at the expiration of forty-five days without the court passing on said motion, under Rule 330, Texas Rules of Civil Procedure, the motion was, on March 9th, overruled as a matter of law. In due time the plaintiff perfected his appeal and the case is before this court upon nine assignments of error, all of which, with the exception of one, relate to the alleged misconduct of the jury and opposing counsel.

The City of Corpus Christi carried a workmen's compensation policy of insurance issued by the Insurance Company

and plaintiff, as an injured employee, came within its provisions and was receiving $25 per week and other benefits as the result of his injuries.

Plaintiff's first point is: "The undisputed fact that the jury during its deliberations discussed the proposition that defendant supposedly had no protective insurance entitled plaintiff to a new trial as a matter of law."

The plaintiff introduced a copy of the compensation policy in evidence before the jury and also placed upon the witness stand the insurance adjuster and proved by him that the Insurance Company had paid to the plaintiff and for his benefit something over $3000 and had made certain stipulations in reference thereto, none of which was objected to by the defendant.

Upon the hearing of the motion for a new trial ten of the jurors that served during the trial were called and testified. The juror Guy West testified:

"Q. When you gentlemen went out to consider your verdict, Mr. West, and before you ever got to Issues 18 and 19, which were the ones on blowing of the siren, state what discussion, if any, there was about the defendant, Rossi, not having any insurance. What was said in the discussion? A. It came up on several different occasions, in fact all during the discussion of this question, whether or not Mr. Rossi had any insurance. I made the statement that I couldn't understand how a business man like Mr. Rossi couldn't have any insurance.

"Q. In that connection, did anybody else make any observations about the automobile being new and that having something to do with it not being insured? A. Yes, sir.

"Q. What was that? A. That it was a new car, it had only about 1500 miles on it, and maybe he hadn't had time to take out insurance, that maybe that was the reason it wasn't insured.

"Q. Was that discussed before you got to Issues 18 and 19? A. Yes, sir.

"Q. In connection with that matter, Mr. West, was there anything said about his not having any protection? A. I don't

quite know how to answer that. I made the statement that although I felt we should give Mr. Gillespie something, I didn't see any reason to break Mr. Rossi's back, because there were cases where judgments were found against people that they never recovered from, and we didn't want to just go all the way and try to ruin somebody.

"Q. (By the Court). Do you recall that part of the charge which I read to you which says: 'Do not speculate on matters not shown by the evidence and about which you are not asked any questions. Remember you cannot guess your way to a just and correct verdict' and the part which says: 'Do not decide who you think should win, and then try to answer the questions accordingly. Simply answer the questions as you find the facts from the evidence, without concerning yourselves about the effect of your answers.' Do you remember that? A. Yes, sir, I remember that first part very distinctly, but it just kept popping in there. Somebody would mention it.

"Q. (By Mr. Lewright, counsel for defendant). Mention what? A. About the insurance. Not the foreman, but one of the other men. It just kept popping up.

"Q. (By the Court) Who popped it up? A. It was in my mind a lot. I talked about it a couple of times myself."

The juror Jack D. McKee testified:

"Q. Now, I'm going to ask you some questions, Mr. McKee, and I want you to limit your answers to what was actually discussed and actually said, not what somebody secretly thought. A. I will try.

"Q. Going down the discussions and remarks before you ever got to Special Issues 18 and 19, which were the two issues on the blowing of the siren, was there any character of discussions as to the defendant, Rossi, having or not having insurance? A. Yes, sir.

"Q. Now, in your own words, Mr. McKee, just what was that discussion? A. I think there was one, if you gentlemen quite understand, not knowing all of the men on the jury, but I probably couldn't know anyway just who said what.

"Q. Tell us what discussion there was and what was said the best you recall it. A. Well, we discussed quite a bit about Mr. Rossi's insurance because there was nothing brought out about him having any, which we talked about, and then we so figured he didn't have any.

"Q. Did some juror make the open discussion that if Rossi did have insurance that it would have been shown? A. Yes, sir.

"Q. State in your own way now just what that argument or discussion was with reference to somebody having insurance and somebody else not having insurance. A. Well, we discussed that if Mr. Rossi had had insurance it would surely have been brought out.

"Q. Why? A. Well, because it was brought out on the other side and if he had it, they would want us to know about it, and in other words, nothing said about it and evidently didn't have any.

"Q. Just how often and to what extent did that go on? A. Well, that practically went on all the way through, sir."

The juror H. L. Humphrey testified:

"Q. Just in your own words, Mr. Humphrey, what open discussion did you hear, if any, about the question of Mr. Rossi having protecting insurance or not having protecting insurance? A. Well, it bobbed up several times, the question as to whether Mr. Rossi did have insurance or not. Of course, we all knew we couldn't consider that part of it, but every once in a while it would bob up as to whether he did or not.

"Q. Well, were some of the jurors expressing the opinion that he did have insurance and others he didn't have? A. There were some figured that he did have and others said, surely he didn't because it wasn't brought out in court.

"Q. Now, in connection with that, did you hear any discussion about the fact that the evidence had shown that the City had compensation insurance and that that had been shown in the trial? A. Well, yes, we figured that that maybe that offset that. It was brought out that Mr. Gillespie had compensation. We decided then that being the case that if he had had that why surely it would have been brought out if Rossi had any.

"Q. Where these expressions developed was that openly discussed by some member of the jury? A. Yes sir, three or four different times.

"Q. (By the Court). In my charge do you recall my reading to you some instructions which I said should strictly be followed and among them was this: 'Do not speculate on matters not shown by the evidence, and about which you are not asked any questions. Remember that you cannot guess your way to a just and correct verdict,' and further, 'Do not decide who you think should win, and then try to answer the questions accordingly.' A. Yes, sir.

"Q. Do you remember my reading that? A. Yes, sir, I remember that.

"Q. Well, can you give me any explanation as to why this mater was brought up in—A. Well,— ·

"Q. —in violation of my definite instructions? A. No, sir, I don't Judge, only just every once in a while that question would bob up with somebody arguing with whether Mr. Rossi had insurance or not.

"Q. Did anyone say that the Judge had said those matters couldn't be considered? A. Yes, sir, and when it was brought up the jury foreman would call us down."

The juror John T. Hilbert, foreman of the jury, testified:

"Q. Before you ever got to Special Issues 18 and 19, what discussion, if any, was there about the defendant Rossi having or not having protecting insurance? A. There were any number of discussions about it. I had quite a lot of trouble trying to keep them from talking on the subject because we understood that wasn't in the evidence, or I did.

"Q. And you cautioned them not to discuss it? A. Not once, but several times.

"Q. Several times—Now, in connection with that was there any remark made about the record of the evidence having shown that the plaintiff had some compensation insurance? A. Yes, I believe that was discussed, I believe, if I remember right.

"Q. Well, in what way was it discussed and whether as compared with the defend-

ant Rossi's condition or situation? A. Well, it was said he was paid for, I believe, $25.00 a week for so many weeks.

"Q. Was there any discussion by any of the members of the jury that the record would have shown had he had any insurance because it had already been shown that the plaintiff had compensation insurance? A. There was a good deal of speculation as to whether he had insurance or not.

"Q. (By the Court). During that three hour discussion what were the various things you discussed? A. The question was whether we should say 'Yes' or 'No' on those things.

"Q. In other words, did you discuss the facts in the case, whether or not the siren was blowing or should have been, or discussing some other facts? A. We discussed, by the time I got them off the insurance proposition, we discussed whether it was blowing in time or whether blowing long enough.

"Q. Did you caution them on several occasions about the insurance? A. Yes, seven or eight times, they would get to talking about that.

"Q. Each person who testified says you did caution them, would they come back to the subject? A. Come back to it sooner or later."

The juror H. P. Yeager testified:

"Q. Now, I'm going to ask you some questions about what discussions there were, Mr. Yeager, and in giving your answers limit them to what was actually discussed or said by any members of the jury as distinguished from what somebody might have mentally thought or concluded. Before you ever got to these Special Issues 18 and 19, which were the two issues on the blowing of the siren, what discussion by the jury was there about Rossi having or not having protecting insurance? A. Quite a lot.

"Q. Well, will you just in your own words, Mr. Yeager, state what those discussions were, what was said about it? A. Well, main thing was we were wondering why it wasn't brought up in court.

"Q. Well, was there any discussion about comparing the fact the record showed that the plaintiff had some compensation insurance and there had been no showing of whether the defendant had any protecting insuance or not? A. That is right. There was—It was proven that Mr. Gillespie did have a certain amount of compensation, whereas the other one didn't; he should have had—it should have been brought out.

"Q. If he did have it should have been brought out in the trial? A. Yes."

The juror Tom B. Paschal testified:

"Q. Before you ever got to Special Issues 18 and 19, which were the issues on blowing the siren, what discussion, if any, was there, Mr. Paschal, about whether Mr. Rossi had protecting insurance or not? A. Well, somebody asked as to whether he recognized he had any liability insurance— I don't remember exactly how it was brought out, but then somebody else said he must have had insurance—he must not have had insurance because it wasn't brought out because the other, Gillespie's, was brought out.

"Q. By the other, Mr. Paschal, are you referring to the Workmen's Compensation Insurance that the City was shown to have carried? A. That is correct.

"Q. All right, just proceed. A. And then somebody said that he surely did have by him having a new car, something to that effect, and somebody thought he hadn't had time to get the insurance, the other side of it."

The juror Leon R. Bernson testified:

"Q. Now, before you ever got to Special Issues 18 and 19, which were the issues about blowing of the siren, what discussion, if any, was there in the jury room about the defendant Rossi having or not having protecting insurance? A. I didn't particularly pay much attention to that because it was just mentioned several times and it wasn't brought out very much. It was just —I don't remember which one of the jurors mentioned it—It was just mentioned and it seems like a couple of them was talking about it. That is the only thing I remember about that.

"Q. Do you recall any juror making an argument in connection with it, comparing the plaintiff's position in carrying Workmen's Compensation and the record showing there was compensation? A. You mean whether Gillespie had received any compensation for his injury? Is that what you mean?

"Q. No, whether Rossi did have or didn't have liability insurance. A. There were several mentions to that fact, yes.

"Q. Was there any discussion about the automobile being new in connection with having or not having insurance? A. Well, yes, one of the jurors, I think it was, mentioned that he may not have had insurance because the automobile was new, but that was just mentioned in the jury room."

The juror C. L. Burchers testified:

"Q. Before you ever got to Special Issues 18 and 19, which were the issues about the blowing of the siren, what discussion, if any, was there about the defendant Rossi having or not having protecting insurance? A. They would bring up insurance all of the time. I says, 'We are not trying no insurance company. This is two private parties suing in a lawsuit.' They kept bringing, bobbing up this insurance business all of the time.

"Q. Well, what was the nature of the discussion they had about that? What was said? A. Well, they would say he has got or anybody carries insurance. I says, 'Well, we can't consider that, what he is doing or nothing else. This is two people in a lawsuit.'

"Q. Well then, what discussion was there about whether Rossi had or didn't have protecting insurance, the defendant Rossi? A. Well, I couldn't say. I don't remember about it.

"Q. In other words, just what I am getting at, just what was the nature of the remarks made as to whether Rossi was or was not carrying liability insurance? A. Well, some of them in there said, 'I know a man who can afford a car like that gets liability insurance.'

"Q. What were some of the others? A. Some of the others said, you can't tell; frequently you have a car you might neglect taking out insurance on it, such words as that, and I would reply back, 'We are not arguing an insurance case. We are arguing a suit between two parties.'"

The juror Floyd Hill testified:

"Q. During your deliberations and before you ever got to Special Issues 18 and 19, which were the two issues about whether it was negligent not to blow the siren sooner than it was blown, what discussion, if any, was there about whether the defendant Rossi had or did not have any protecting insurance? A. Well,—

"Q. In other words, in your own words, just state what that discussion was, what remarks were made. A. Well, several of the jurors didn't think he had any; most of them, I think, were ready to believe that he didn't have any insurance, and I know some of them said that it seemed strange that a business man wouldn't be protected by insurance, and others said, well, they maybe just come out and they felt the insurance had just expired."

Rule 327 TRCP provides: "Where the ground of the motion is misconduct of the jury or of the officer in charge of them, or because of any communication made to the jury or that they received other testimony, the court shall hear evidence thereof from the jury or others in open court, and may grant a new trial if such misconduct proved, or the testimony received, or the communication made, be material, and if it reasonably appears from the evidence both on the hearing of the motion and the trial of the case and from the record as a whole that injury probably resulted to the complaining party."

■■ The burden of proving jury misconduct and probable injury resulting to him rested upon the plaintiff. Barrington v. Duncan, 140 Tex. 510, 169 S.W.2d 462, 465. The undisputed testimony of the jurors that they discussed and considered the fact that the defendant was or was not protected by insurance constituted misconduct as a matter of law because they went beyond the record and discussed a matter that was not in evidence and which was entirely irrelevant to any issue submitted to them and one that was calculated to

cause injury. Now, the question arises: does it reasonably appear that the plaintiff was probably injured by reason of said misconduct?

■ The evidence of the jury shows that Issues 18 and 19 were deliberated upon by the jury from forty-five minutes to two hours before they were answered. On the first ballot the jury voted seven to five or eight to four to answer Issue 18 "yes", but after a long discussion they finally answered "yes" to said issues, finding it was negligence on the part of the plaintiff in not sounding the horn on his motorcycle sooner than he did, and that such negligence was a proximate cause of his injuries. These issues were hotly contested; they could have been answered "yes" or "no" because the evidence was sufficient to sustain either finding. In Barrington v. Duncan, supra, the Supreme Court, speaking of jury misconduct in discussing the fact that the defendant did have or was required to carry insurance before he could operate his truck, said: "This court takes judicial knowledge of the fact that a jury is more apt to render a judgment against a defendant, and for a larger amount, if it knows that the defendant is protected by insurance."

In Rojas v. Vuocolo, 142 Tex. 152, 177 S.W.2d 962, 964, counsel for the plaintiff and counsel for one of the defendants agreed that this defendant could testify that he did not have liability insurance. Counsel for the other defendants objected to said proof and the court overruled said objection and permitted the witness to testify that he did not have any insurance. The court reversed the case, and in part said: "While this court has not directly passed upon the question of whether a defendant should be permitted to prove he has no protecting insurance against the damage sought by plaintiff, it has settled the point that it is error to permit the jury to hear proof that defendant has such insurance. * * * Obviously, if proof, as an independent fact, that a defendant has insurance is improper because it has no bearing on the independent questions of negligence and damages and is calculated to injure defendant, then proof that defendant has no protecting insurance is calculated for the same reason to injure plaintiff. The answer in either case is that the proof should not be heard because it is irrelevant and its consideration by the jury is calculated to work injury."

and cited Piechuck v. Magusiak, 82 N.H. 429, 135 A. 534, wherein the court, in passing upon the question of whether or not the defendant should be permitted to prove, as an independent fact, that he was not insured against liability which the plaintiff was seeking to establish, held that said testimony was inadmissible, and said: "It may be urged that the evidence which was received subject to exception merely tended to prevent such improper course of procedure, and that since this was its only effect its admission could work no legal harm to the plaintiff. One difficulty with this argument is that it does not appear that the jury may not have made other use of the fact. They may have thought that it would be too bad to make an uninsured man pay. The evidence is a form of the inadmissible plea of poverty."

Myers v. Thomas, 143 Tex. 502, 186 S.W. 2d 811, 813, was an injured employee's action against a negligent third party, in which the State of Texas, through the State Highway Department as self-insurer, intervened. The trial court's refusal of the State's motion to keep from the jury facts relating to the benefits paid to the plaintiff was held to be reversible error, and in passing upon whether admitting the evidence was prejudicial, the court said: "We are persuaded by the fact that any testimony which is immaterial, and tends to becloud the issues and confuse and mislead the jury, is prejudicial in its effect."

■ As we understand the rule as applied to the facts of this case, it was the duty of the jury to answer the issues without regard or consideration as to whether the defendant did or did not have protective insurance. The numerous and extended discussions by the jury on this subject convinces us that the jury did not follow this rule. If they did, why was the question as to whether the defendant did or did not have insurance brought up so frequently during the consideration of their verdict?

One juror testified the question of insurance "bobbed up" practically during their entire deliberation. The foreman testified by the time he got them off the insurance proposition they discussed whether the siren was sounded in time; that he cautioned them not to discuss or consider the insurance question seven or eight times but they would come back to it sooner or later. One juror went so far as to say that he "didn't see any reason to break the defendant's back because there were cases where judgments were found against people that they never recovered from." Not from the mental processes that actuated the jury in reaching its verdict, but from the overt acts and conduct of the jury as disclosed by the record, it is shown that some of the jurors had fixed opinions that the defendant did not have insurance, which they freely and frequently expressed during their deliberations, and this occurred over the many admonitions of the foreman not to do so. We are of the opinion that the record as a whole reveals a reasonable probability that some of the jurors were influenced by said discussion and in their firm belief that the defendant did not have protective insurance in passing upon the issues in question. As heretofore said, it was the duty of the jurors to pass upon the issues without regard or consideration as to whether the defendant did or did not carry insurance. This they failed to do, and such failure reveals error and probable injury to the plaintiff. Plaintiff introduced evidence, without any objection from the defendant's counsel but apparently with his acquiescence, that the plaintiff was receiving compensation insurance benefits, but we are of the opinion that this evidence would not give the jury the right to go beyond the record and discuss and consider whether the defendant was or was not insured. Lackey v. Moffett, Tex.Civ.App., 172 S.W. 2d 715.

Apparently the trial court tried to conduct the case under the rule announced in the case of Myers v. Thomas, 143 Tex. 502, 186 S.W.2d 811. Before the plaintiff introduced the compensation insurance policy in evidence and before he placed the insurance adjuster upon the stand and proved by him that the insurance company had paid to the plaintiff and for his benefit something over $3000 under the terms of said policy, and before any stipulations were made by counsel in respect to the rights of plaintiff under the policy, the following proceedings took place before the jury:

While plaintiff's witness, Dr. Rodholm, was being cross-examined by defendant's counsel, Mr. Lewright, Mr. Lewright addressed the court:

"Your Honor, I don't want to violate your ruling on this at the outset of this case. I want to ask the Doctor a question, whether he has been paid, and if so, by whom.

"The Court: Will that elicit an answer that would be within the Myers case?

"Mr. Lewright: I imagine it would.

"Mr. Kirkham: (Counsel for plaintiff) Yes, that is what it will do.

"The Court: I am going to have my ruling stand.

"Mr. Lewright: Uh-huh.

"The Court: That would be improper and inadmissible.

"Mr. Lewright: Then I wouldn't want to inquire it—I would rather ask him out of the presence of the jury and make my bill."

But before the jury was retired Mr. Lewright asked the doctor:

"All right, Doctor, it is a fact, is it not, that you have rendered no bill to Mr. Gillespie for your services, and you don't expect to bill Mr. Gillespie for your services?

"Mr. Kirkham: I am going to object to that, your Honor.

"The Court: I am going to sustain the objection.

"Mr. Lewright: To which we except, your Honor."

The jury was then retired and the following occurred:

"Mr. Lewright: Now Doctor, if you will, what is your answer since the jury retired? What is your answer to my question?

"Mr. Lewright: Will you read him the question? (The question was read by the Court Reporter).

"A. I wouldn't state it as a matter of fact, I am speaking under oath; that was attended to by Mr. Thomas in my office; I believe he has stated Travelers' Insurance Co., if I might say so; I'm not testifying on the point, I am stating a belief.

"Q. But you consider your statements have been rendered to Travelers' Insurance Co. and have been paid by them? A. I can't say whether they have been or not.

"Q. But at any rate, you have instructed your office manager—A. I haven't given instructions either way, as a matter of fact.

"Q. Either way? A. I don't recall I have.

"Mr. Moursund: Let's see if we can stipulate that.

"Mr. Kirkham: I would be glad to stipulate the City of Corpus Christi is carrying a voluntary policy of Workmen's Compensation on the employees of the City of Corpus Christi, under the terms of which they are paying the same amount provided for under the Workmen's Compensation Act of the State of Texas, and have exactly the same right of subrogation.

"Mr. Lewright: We are not agreeing to that as a stipulation.

"Mr. Kirkham: For negligence or upon negligence of a third party and upon being admitted to hospital all services rendered by various doctors and hospitalization the Travelers' Insurance Company being primarily subrogated for payment of bills during the period of disability and for his doctor and hospital bills when due or cause them to be paid.

"Mr. Lewright: We are not agreeing to that as a stipulation. We don't agree.

"The Court: It makes no difference whether there is a stipulation or you don't stipulate, and I say that is a misunderstanding now and there is no stipulation.

"Mr. Lewright: And we don't agree to any of it.

"The Court: That leaves us now where we were.

"Mr. Lewright: Yes sir.

"Mr. Moursund: Let's ask if we can stipulate to the facts.

"Mr. Lewright: No, let's don't stipulate anything."

Also, before plaintiff offered the policy in evidence and before proving he had received certain benefits under said policy, and prior to the time plaintiff's and defendant's counsel made stipulations in respect to the rights of the plaintiff under said policy and while plaintiff was on the witness stand, plaintiff's counsel was attempting to prove up the doctor, hospital and medical bills which plaintiff had incurred on account of his injuries, the following proceedings took place in the presence of the jury:

"Mr. Kirkham: Q. For the purpose of the record, Mr. Gillespie, I want you to state what hospital, doctor and medical bills have been incurred in your treatment.

"Mr. Lewright: We object, your Honor, for the reason that as the court knows, these bills have not been rendered to this man. The testimony from this man would constitute pure hearsay on this evidence of what the bills are and from whom given would be beyond the province of this man, or by whom incurred, and we object to any testimony from this witness.

"Q. If you knew, Mr. Gillespie—would you please say what those bills—A. The hospital bills?

"Mr. Lewright: May I ask a question on voir dire?

"The Court: You may.

"Mr. Lewright: Have you been presented with bills for any part of your treatment? A. I have seen all of them myself, personally and asked what my bills were.

"Q. Have any of them ever presented a bill against you and asked you to pay it? A. No, sir, they haven't.

"Mr. Lewright: We object to any testimony to or concerning bills, any bill against a third person; that third party's testimony would be the only one that would be admissible testimony on this as to what has been incurred, and third party's testimony would not be binding to or upon the defendant and could affect no recovery therefor.

"The Court: Overruled.

"Mr. Lewright: Exception."

On Cross Examination:

"Mr. Lewright: Q. So far, Mr. Gillespie, you have never been called on to pay any of these bills?

"Mr. Kirkham: I object to this, your Honor. It is something that is highly prejudicial and irrelevant, and something the defendant couldn't take advantage of, has no right to any minimizing of damages. These bills are incurred in this case and it is the same thing the court has ruled on.

"The Court: I have previously ruled on that as sustained objection.

"Mr. Lewright: All right, Judge, we except. May we develop our bill afterwards?

"The Court: You certainly may.

"Q. You say all those bills have been paid? A. I don't know whether they have been paid or not.

"Mr. Kirkham: We object to that as irrelevant and immaterial and highly prejudicial.

"The Court: Overruled.

"Mr. Kirkham: Note our exception.

"The Witness Answered: All of them, I know, haven't been.

"Q. And you haven't paid any of them?

"Mr. Kirkham: If the court please, we object to that as highly prejudicial and irrelevant to any issue in this case.

"The Court: Same ruling."

We can see no other purpose on the part of defendant's counsel in persistently pursuing the course as reflected by the foregoing proceedings except to create in the minds of the jury the opinion that the plaintiff had some character of protection in the way of insurance, and we are of the opinion that counsel's conduct did in all probability have that effect. The fact that the plaintiff later introduced the insurance policy and made proof that he had and was still receiving benefits under it should not estop him from asserting the misconduct of the jury as herein complained of.

■ Plaintiff's points 3 to 8, inclusive, pertain to alleged misconduct of opposing counsel, six of which complain of certain portions of his argument to the jury. Plaintiff objected to some parts of the argument now complained of and to some parts no objection was made, but where plaintiff objected the court promptly sustained such objections with one exception. Plaintiff in no instance requested the court to instruct the jury not to consider said argument. We have read the entire argument and are of the opinion that it is not so inflammatory that its ill effect, if any, could not have been removed by a proper instruction of the trial court, which the plaintiff did not request, thereby waiving such errors, if any.

■ The court did not sustain plaintiff's objection to counsel's argument that the evidence showed that the plaintiff was protected by compensation insurance. The plaintiff introduced in evidence before the jury a copy of the policy and placed upon the witness stand the adjuster of the Insurance Company and proved by him that it had paid to the plaintiff and for his use and benefit something over $3000. The record also discloses that the plaintiff and defendant's counsel made certain stipulations in respect to plaintiff's rights under the compensation policy, all of which took place before the jury. Counsel discussed facts that the jury had knowledge of and which they obtained during the trial and from the evidence put before them by the plaintiff. Therefore the same could not constitute reversible error.

What we have said concerning this portion of the argument complained of applies to plaintiff's point No. 3.

Plaintiff's 9th and last point is: "Admission, over plaintiff's objection, of evidence to effect plaintiff was still being paid salary voluntarily by the City of Corpus Christi, was improper and so prejudicial as to entitle plaintiff to a new trial."

■ The record shows that the defendant, over the objection of the plaintiff, was permitted to prove that the City was still paying the plaintiff his salary. After this testimony was admitted the plaintiff placed Mr. R. L. Bellflower, Chief of Police of the City of Corpus Christi, on the stand and proved by him that the City was still paying his salary. Then plaintiff moved the court to instruct the jury to disregard any testimony about voluntary payments made

by the City. The court gave to the jury the following instruction: "Gentlemen of the Jury: You will disregard entirely and consider for no purpose the testimony pertaining to payment of plaintiff's salary since the accident in question." Therefore the assignment is overruled.

The judgment of the trial court is reversed and the cause remanded.

HALE, Justice (dissenting).

As I understand the majority opinion in this case, the judgment of the trial court is being reversed as to all parties solely because of the alleged misconduct of the jury in discussing the proposition that appellee, hereafter referred to as defendant, supposedly had no protective insurance. Being unable to agree to the judgment of reversal and the opinion upon which it is based, I respectfully enter my dissent thereto for two principal reasons, viz: (1) it appears to me that appellant, hereafter referred to as plaintiff, is in no position to complain of the conduct of the jury in discussing whether defendant did or did not have any insurance coverage, and (2) I do not think plaintiff has discharged the burden of showing that the discussion of which he complains constituted material misconduct of such character that injury probably resulted to him, within the meaning of Rule 327 TRCP.

On February 8, 1951, our court handed down its original opinion in this cause in which, for the reasons therein set forth, it overruled each of the 9 points of error upon which the appeal is predicated. Although I was not in full agreement with the reasons therein set forth as to why plaintiff's First Point should be overruled, I was in agreement with the conclusion there reached for the reasons upon which this dissent is now based.

It was undoubtedly improper for plaintiff to prove or offer to prove, in the presence of the jury, as he did, that he was a beneficiary under the compensation policy as alleged by Travelers' Insurance Co., hereafter referred to as the insurance company, or the amount of benefits which had accrued or would accrue to him thereunder, or that his action against defendant was brought with the consent of the insurance company, because all of these matters were irrelevant and immaterial in so far as the jury was concerned and were reasonably calculated to confuse and mislead the jury and becloud the issues which the jurors were being called upon to decide. Myers v. Thomas, 143 Tex. 502, 186 S.W.2d 811 and authorities. All of the able and experienced counsel in this case must have known that such improper conduct would in all reasonable probability open up a veritable "Pandora's box" on the question of protective insurance, and they should have anticipated and foreseen that some such discussion as that which actually occurred in the jury room might reasonably be expected to result from such misconduct, regardless of any proper admonitory instruction which the trial court might give to the jury with respect thereto. To have expected less from the jurors would have been to expect too much of human nature or too little of human intelligence, or a combination of both.

My brethren are inclined to the view, as expressed in the majority opinion, that the improper conduct of plaintiff in electing to prove before the jury the status of his contractual relation with the insurance company was induced either in whole or in part by the misconduct of counsel for defendant in creating in the minds of the jury the opinion that plaintiff had some character of protection in the way of insurance before the plaintiff made direct proof of that fact. I do not share that view. I find nothing which indicates that counsel for defendant improperly attempted at any time to prove in the presence of the jury that the defendant or plaintiff did or did not have any insurance protection. But, be that as it may, if the counsel for defendant had done so, or if he improperly prodded the counsel for plaintiff into such misconduct, I fail to see how that would relieve either of the parties from the consequences of the mutual misconduct of both. On the contrary, it appears to me that such action would only estop both of the parties from complaining of what they had deliberately induced the jury to do. After the plaintiff had introduced in evidence before the jury

the policy of insurance described in the insurance company's plea in intervention, he placed the insurance company's adjuster, Alverson, on the witness stand, and after having proved by Mr. Alverson the amounts which the insurance company had paid out to plaintiff and for his benefit, the counsel for plaintiff then asked Mr. Alverson as to whether plaintiff had obtained from the insurance company authority to bring this suit against the third party defendant, and after some exchange of the views between the counsel for plaintiff and defendant as to whether plaintiff was entitled to make such proof before the jury, it was then stipulated in the presence of the jury that plaintiff had not waived any of his rights against the insurance company by bringing this suit and that the insurance company was obligated to make compensation payments to plaintiff for 401 weeks, amounting to approximately $10,000.

I see no valid reason why plaintiff's counsel should have willingly injected the complete status of plaintiff's protective insurance into the case in the presence of the jury upon any theory except the supposition that such improper matter would tend to swell the amount of the damages which the jury might award, if any, so that plaintiff would have a substantial amount for his own benefit after the insurance company had recouped its loss in the approximate sum of $10,000. I believe the trial judge was authorized under all the evidence adduced at the hearing of plaintiff's motion for new trial to find that whatever discussion the jurors might have had with respect to whether defendant did or did not have protective insurance emanated from and was attributable solely to the improper conduct of counsel in deliberately injecting into the case the status of plaintiff and the insurance company with respect to compensation insurance. Hence, upon the most elemental principles of waiver and estoppel which underlie the doctrine of invited error, I do not think the plaintiff is in any position to complain of the conduct of the jury in discussing the matter of protective insurance. 3 T.J. p. 1031, Sec. 731.

The record in this cause shows that plaintiff and the insurance company were each represented in the trial court by the law firm of McCampbell, Wood & Kirkham. The insurance company did nothing in the trial court other than to file and present its plea in intervention. It did not object to anything that happened in the court below and it has not appealed or attempted to appeal from the judgment that was rendered against it. Since plaintiff's counsel definitely chose to introduce the subject of protective insurance to the jury as an attractive lure on behalf of their client, regardless of why such was done and poisonous though such subject was in its obvious possibilities, it appears to me that in all good conscience plaintiff has no just ground for complaint because some or all of the confused jurors hesitated or refused in the consideration of the beclouded issues to swallow the hook, line and sinker, along with the tainted bait, which had been improperly cast in their midst. Having definitely aimed and fired for a swollen recovery, it is my opinion that plaintiff should not now be heard to complain of missing the mark, even though his faulty marksmanship might have been due in part to the recoil of an overloaded gun.

Furthermore, if it could be said that plaintiff is in any position to complain of the alleged misconduct of the jury in discussing the proposition of protective insurance, I do not think he has conclusively discharged the burden of showing material misconduct of such character that injury probably resulted to him. Some of the jurors testified that during their deliberations concerning a proper answer to issues 18 and 19 they were of the opinion that it was not of much importance how they should answer such issues because they had already found the defendant was negligent. Most of the jurors testified in effect that they thought plaintiff wuold be entitled to recover a judgment against defendant under the verdict they had rendered. Of course, each and all of the jurors knew and could not help but know without any evidence of any kind whatsoever, that the defendant either did or did not have protective insurance. One or the other horns of that dilemma would necessarily be a self-evident fact to anyone. However,

there was no showing from the evidence in this case that any particular juror was of the opinion that defendant did or did not have any protective insurance at the time when he finally voted "Yes" on issue 18 or 19, or that he was in any wise influenced to vote "Yes" on either of such issues (because he was of the opinion that the defendant did not have such insurance.

Viewing all the evidence adduced upon the hearing of plaintiff's motion for new trial and upon the trial of the merits in the light most favorable to the trial court's judgment and action in failing to grant a new trial, as I think it is the duty of our court to do, I cannot say that material misconduct was shown or if so that, from the record as a whole, injury probably resulted to plaintiff by reason thereof. In my opinion the judgment should be affirmed.